GAUDIN, Judge.
Charles M. Gervais pled guilty to the June 9, 1987 first degree murder of Andre Daigle, whose beaten and strangled body was stuffed inside a sofa and dumped off the Interstate 55 highway between Laplace and Manchac, Louisiana. Gervais’ earlier motion to suppress taped and written confessions had been denied in the 24th Judicial District Court. He reserved his right to appeal the denial, citing State v. Crosby, 338 So.2d 584 (La.1976).
He now contends, as he had done in district court, that he had requested an attorney before confessing but that police officers tricked him in violation of his right to remain silent and his right to an attorney.
It is apparent from the testimony that Gervais had in fact refused to speak with police officers and had asked for a lawyer after being taken into custody. Later, at the police station, he argues, the police duped him by making it appear that a fellow suspect was signing a written confession placing all of the blame for Daigle’s murder on him (Gervais). Fearful of this possibility, Gervais said, he confessed.
The trial judge who heard the motion to suppress found that Gervais initially refused to waive his constitutional rights but later “he initiated conversations with the police and then decided to waive his rights.”
The testimony and evidence support this finding. Accordingly, Gervais’ plea of guilty and his sentence to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence are affirmed.
The pertinent events leading up to Ger-vais’ arrest and his subsequent confessions are as follows:
On June 14, 1987, at 1 a.m., Pearl River, Louisiana police officer Thomas Corley was on patrol when a pickup truck, driven by Gervais, went by. Almost immediately thereafter, another vehicle drove up to Cor-ley’s automobile. The driver told Corley that the pickup belonged to Andre Daigle and had been stolen. A high-speed chase, with the pólice unit going 100 miles per hour, ensued.
When the pickup was finally stopped by Corley and a backup police car driven by Captain David McKenzie, Gervais and a passenger, Michael Phillips, exited. Corley advised them of their Miranda rights and asked Gervais for his driver’s license, which he didn’t have, and the automobile registration form, which he couldn’t produce.
While Corley was questioning Gervais and Phillips, McKenzie looked into the truck and saw two weapons. McKenzie contacted the police station by radio, giving Gervais’ and Phillips’ names, and was advised that Gervais had a felony record.
McKenzie testified:
“Being the vehicle in question was possibly stolen, I got both of the subjects together; I verbally Mirandized them again. At this point I separated them, and I asked each one of them, separately, if they knew anything about where the owner of the vehicle was. The first one I spoke to was Charles Gervais, and which at that point he advised me he wanted to see an attorney
“He was placed in officer Corley’s police car. I advised officer Corley that the subject wanted to speak to an attorney; therefore, I didn’t want any questioning done inside the vehicle. I wanted no speech, no contact verbally between the two while they were in transport.”
At that point in time, both policemen thought they were handling a stolen vehicle case. Only later was it learned that the pickup’s owner had been murdered.
When Gervais and Phillips, in custody, reached the police station, they were taken to different desks and again advised of their rights. Gervais refused to sign a waiver form. Phillips, however, did sign a waiver form. He then said that the truck *557 belonged to Gervais’ employer and that Gervais had picked him (Phillips) up prior to driving to St. Tammany Parish, where Pearl River is situated.
Chief Ben Raynor of the Pearl River Police Department arrived at the station. He was told that Phillips had executed a waiver and that Gervais hadn’t. Raynor asked that Phillips be brought into his office for further questioning. Raynor spoke with Phillips for “five to eight minutes,” according to Raynor.
Raynor then asked for Gervais, and he was brought to the booking room where Raynor was.
Raynor testified:
“He (Gervais) didn’t have nothing to say. He said, T don’t have nothing to say to you.’ and I said, ‘Fine, take him back out, bring him to the back and bring me the other one.” Raynor and the other Pearl River police officer still did not know that the pickup’s owner was dead.
Raynor spoke again with Phillips. Ray-nor then told McKenzie to get a written statement from Phillips because, Raynor said, “... each time his (Phillips’) stories had a conflict.” Phillips was placed at a desk and he began writing.
About two minutes later, Gervais, who had been observing Phillips, spoke to McKenzie.
McKenzie testified:
“He (Phillips) began writing the statement. A couple of minutes, I was watching about what he was placing on the statement, and Charles Gervais then advised me that he wasn’t going to take the rap, that he wanted to speak to the Chief. At that point, I advised him that he wanted to see an attorney; he wished not to answer any questions, make any statements, and I advised him that he should take that into consideration. Charles Gervais says, ‘I want my rights form. I want to waive them. I want to speak with the Chief. I want to do anything I have to to speak with the Chief. I want to tell him what happened.’
“I advised him of his Miranda rights again; I went over his waiver form with him. At that period of time, he advised he wanted to sign his rights and he wanted to waive his rights. And he did so.”
McKenzie stated that nothing was said to Gervais once Phillips started writing. There were, McKenzie testified, no threats and no promises.
Gervais was then taken to Raynor, who was handed the waiver forms signed by Gervais. From Raynor’s testimony:
“Captain McKenzie handed me the rights form. And I said, ‘So, he’s changed his mind?’ And he (Gervais) made the comment, ‘We did it.’ And I told him, I said, ‘Sit down.’ Then David closed the door. And then the second thing he (Gervais) said to me was, he says, ‘We did it.’ And I said, ‘Okay. Why don’t you tell me the whole story.’ He said, ‘We killed him.’ And then I said, ‘Hold it. Stop.’ I didn’t know what he was talking about. I said, ‘Hold it. I want to get a tape.’ And at that time I told him to be quiet for a minute. I got a small cassette tape from out of my drawer. I got a recorder, and I told David McKenzie I wanted him to take a taped statement from him and to readvise him of his rights.”
The Miranda rights were again read and waived and Gervais confessed, telling about his part in Daigle’s murder at 4305 Idaho Street, Apt. B, in Kenner, Louisiana. Gervais was transported to Jefferson Parish, where he met Sergeant James Gallagher of the Kenner Police Department.
Gallagher said that Gervais admitted being advised of his rights and that he had signed a waiver. Gervais, according to Gallagher, said “... he wished to assist us in our investigation ...” The officers and Gervais first went to the Idaho Street apartment where the killing had taken place and then to a spot off Interstate 55 where the body was found.
Gervais and the others then returned to Kenner where the defendant was told he was being charged with murder. Gervais was once more advised of his rights. He again waived them, and gave a written nine-page statement which the trial judge refused to suppress.
*558 In the statement, Gervais described how he and Phillips killed Daigle by hitting him repeatedly with a hammer and then strangling him with a wire coat hanger and an electric cord cut from a light fixture.
Gervais was asked why Daigle had been murdered. “We used excuse of money,” he said in the written statement, “but Andre really didn’t have any money. I think the reason was so that Mike and I could prove to each other that we could do it ... ”
Gervais, Phillips and a woman named Thelma Home were indicted for first degree murder. Gervais filed for a severance, which was granted.
After Gervais invoked his rights and refused to sign a waiver, both at the arrest scene and later at the station, the police were prevented from asking questions and also from any action designed to elicit an incriminating statement. See Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Spontaneous and voluntary statements, however, not made as a result of police interrogation or compelling influence, are admissible in evidence without Miranda warnings even where a defendant is in custody. See State v. Jones, 386 So.2d 1863 (La.1980).
Here, we cannot say that the police in Pearl River used “compelling influence” by having Phillips start to write in Gervais’ presence. First of all, while the officers knew that the truck had been stolen and .that the owner’s whereabouts were unknown, they did not know a murder had been committed. Throughout, Phillips did not deviate (except for one or two insignificant details) from his story that Gervais, in his employer’s truck, had picked him up and then driven him to Pearl River. He said nothing about Daigle.
Gervais did not testify when the motion to suppress was heard. There isn’t anything in the record indicating why he thought or was led to believe that Phillips was writing about his (Gervais’) role in Daigle’s murder. Phillips did testify at the motion hearing but only to deny his signature on various waiver forms and to say that Raynor, Gallagher and other police officers had lied.
If an accused, as Gervais here, reinitiates communications with law enforcement personnel, there should be a two-fold inquiry. It must be shown that the person in custody in truth and in fact and without police influence started the new discussion and that he or she knowingly waived constitutional rights. Gervais’ invocation of his rights was scrupulously honored until he asked to speak with Raynor. Before putting Gervais’ confession on tape in Pearl River and before he signed the written confession in Kenner, Gervais’ rights were read and waived. The trial judge found that Gervais had “... intelligently and knowingly relinquished ...” his rights, and nothing in the record suggests otherwise.
For Gervais to have prevailed in his motion to suppress, he would have had to convince the trial judge that the placing of Phillips, with pen in hand and in Gervais’ view, was police interrogation within the scope and meaning of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The record, however, indicates that procedural safeguards were in place, that Gervais was neither being interrogated nor hoodwinked and that Gervais’ response to seeing Phillips writing was unplanned and unexpected. The trial judge properly denied Gervais’ motion to suppress.
Raynor was surprised when Gervais said, “We killed him.” Before proceeding further, Raynor insisted that rights again be read to Gervais, and they were read.
Not finding a police ploy or any coercive tactic which the police should have known was likely to elicit an incriminating response, the trial judge denied the motion to suppress. We affirm, holding that the police cannot be held accountable for unplanned and unforeseeable results of their words or actions during the normal, routine course of a criminal investigation.
We considered the scene in the police station, when Phillips started to write, from Gervais’ viewpoint and what his perception might have been. Such a constitutional inquiry, without regard to the overt good faith or intent of police officers, is required by Rhode Island v. Innis, supra. *559 What could have caused Gervais to believe that Phillips was going to place the entire blame for the murder on him? We don’t, of course, know the answer, nor did the trial judge. The trial judge did apparently find, however, that one suspect seeing another writing something down does not ordinarily trigger an extemporaneous response as that made by Gervais.
As Gervais’ reaction was unpredictable and not brought on by underhanded police strategy and because he (Gervais) irrefutably knew and waived his Miranda rights before confessing, there was no constitutional violation.
We examined the record for errors patent and there are none. Gervais’ plea and sentence are affirmed.
AFFIRMED.